# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00100-CR

**Kevin David Schoff, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT
NO. A-08-0026-S, HONORABLE JAY K. WEATHERBY, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

A jury found appellant Kevin David Schoff guilty of aggravated sexual assault of a child and assessed his punishment at fifteen years' imprisonment. *See* Tex. Penal Code Ann. § 22.021 (West Supp. 2009). Appellant contends that the trial court reversibly erred by admitting evidence of extraneous sexual conduct and that the evidence as a whole is factually insufficient to support the finding of guilt. We overrule these contentions and affirm the conviction.

## BACKGROUND

Appellant and his wife, Noel Schoff, were married in 1991. They have four daughters, H.S. (thirteen years of age at the time of trial), M.S. (ten), V.S. (eight), and G.S. (six). By all accounts, the marriage was a rocky one. Appellant admitted having a problem controlling his temper, and there were incidents when he would become so enraged that he would throw objects or

put a fist through a wall.  Noel described an occasion when appellant shook her, but there was no evidence that appellant ever struck Noel or a child.  The couple separated on several occasions during the course of the marriage, with the final separation taking place in June 2006.  The girls continued to live with their mother following this separation.

Noel testified that H.S. began having her own anger management problems in 2006. H.S. became increasingly aggressive, both verbally and physically, to her mother and sisters.  Noel took H.S. to counselors, and she ultimately placed H.S. in River Crest Hospital, a mental health facility in San Angelo.  During her two-week stay at River Crest in January 2007, H.S. was diagnosed with post-traumatic stress disorder.

H.S. made her first sexual abuse outcry on March 19, 2007.  Noel testified that she and the girls were at a friend's house for dinner.  She recalled, "[H.S.] was in trouble with me for lying about something, I don't remember what it was, but she was on the bed and I was talking to her . . . ."  Suddenly, "[H.S.] looked like she was thinking about something else . . . .  She seemed to be off in another thought."  Noel asked H.S., "[W]here are you?  What is going on?"  H.S. said nothing at first, but she "spun around and she looked at me and she had this look on her face of fear." H.S. then began to describe several "scenes" involving appellant.  In one, H.S., who had "really, really bad trouble with diarrhea," needed to be wiped, and "when [appellant] wiped her, he was angry and he hurt her" by putting his finger in her sexual organ.  H.S. also said that when appellant tickled her, he touched "her upper leg, tickling her, and then he would put his finger up inside her there, and then there was another time that she was at the mall and she said [appellant] picked her up and had her facing him and then put her on his shoulders, but before he did that, he did it again."

2

Noel reported what H.S. had said to the Tom Green County sheriff's department. On March 27, 2007, H.S. was interviewed by Karla Payne, a forensic interviewer at the Children's Advocacy Center, also called Hope House. Payne testified that during this interview, H.S. described two incidents. The first was in the bathroom when she "had some diarrhea and she asked her dad to come in and wipe her, and . . . he touched her in her period spot."[1] The second was when she and appellant were playing a "Tickle Monster" game and "he tickled her underneath her clothes and he touched her again that time." Payne clarified that in these touches, "his finger went inside her."

In April 2007, H.S. began meeting with Y. D. Garcia, a licensed professional counselor with extensive experience working with sexually abused children. Garcia testified that during these counseling sessions, H.S. described a time when "she was trying to cuddle with her mother in bed and her father put his finger in her . . . period spot," another time when appellant was watching "nasty stuff" on television and "his penis was hanging out," and "a time where . . . she had gone to bed and her father had inserted a knife into her vagina . . . ."

Garcia also testified more generally about childhood sexual abuse. She stated that it is difficult to successfully coach a child to make false accusations of abuse. Garcia testified that in such situations, the child's statements will lack spontaneity and will, over time, become contradictory. She explained that it is common for a child who has been sexually abused by a parent to delay making an outcry until the abusive parent is no longer living with the child, and thus disclosures of past abuse often occur when parents separate. Garcia testified that sexually abused

---

[1] The evidence shows that H.S. referred to her sexual organ as her "period spot."

children sometimes display symptoms of post-traumatic stress disorder, one of which is flashbacks in which they relive the traumatic experience.

Payne conducted a second interview of H.S. at Hope House on September 12, 2007. During this interview, H.S. again described the butter knife incident she had first related to Garcia. H.S. also told Payne that appellant regularly came to her bedroom at night and "touch[ed] her in her period spot and . . . she got scared and she started sleeping on the floor because she was afraid of him hurting her . . . ." During this interview, H.S. reported for the first time that her sisters had also been touched by appellant. A few days later, M.S., V.S., and G.S. were also interviewed at Hope House. Payne testified that each girl said that appellant had penetrated her sexual organ with his finger while bathing her. All four sisters estimated that they had been two or three years old when appellant first penetrated them. H.S. estimated that she had last been penetrated when she was ten.

Following the September interviews at Hope House, the four sisters were examined by sexual assault nurse examiners Angela Wilke and Cathy Sparks. Wilke testified that H.S. told her that appellant "touched me with a knife inside of me" and that "[i]t's been going on for years." Wilke said that H.S.'s hymen had a "complete tear through to the vaginal wall." The tear was "well-healed" and could have occurred "anywhere from six months to ten years" before the examination. According to Wilke, G.S.'s hymen had a "well-healed notch." No evidence of trauma was found during the examinations of M.S. and V.S.

Appellant was indicted in January 2008. The indictment contained four counts, one for each of appellant's four daughters. Each count alleged that appellant intentionally and knowingly penetrated the child's sexual organ with his finger.

All four sisters testified at the trial. H.S. testified that appellant put his finger inside her period spot when they played "Tickle Monster." She also described the incident in the mall, when appellant put his finger in her period spot while lifting her onto his shoulders. H.S. also testified that one night, when she was sleeping on the couch, she saw appellant get a butter knife from the kitchen. He then "took a little part, part of the knife, and put it in me." H.S. said that this caused her to bleed "a little." M.S. testified that appellant "put his finger up my private" while bathing her when she was about two years old. She also said that appellant's finger "went inside" her "front part" once when he was wiping her. V.S. testified that appellant put his finger "in my private" while she was bathing. G.S. testified that when she was "two or four," appellant put his finger inside her "private" while she was in the bathtub.

During his own testimony, appellant acknowledged playing "Tickle Monster" with his daughters and carrying them on his shoulders. He also conceded that he may have touched his daughters' genital areas with his hand while bathing them. He denied, however, penetrating his daughter's sexual organs with his finger.

Appellant's principal defensive theory was that Noel had coached or otherwise induced H.S. and her sisters to make false accusations of sexual misconduct. As defense counsel said during his opening statement, "this is a campaign by Noel Schoff to disassociate and separate herself and her daughters from [appellant] for the rest of his and his daughters' lives." In support of this theory, defense counsel cross-examined several of the State's witnesses—including Noel, the lead sheriff's investigator, the forensic interviewer, and the sexual abuse counselor—regarding the possibility that the children had been coached by their mother. Although Noel denied telling her

5

daughters what to say or encouraging them to accuse appellant of misconduct, the other witnesses acknowledged that coaching was always a possibility. In fact, the defense offered evidence that investigators and counselors initially had doubts about Noel's credibility and were concerned that Noel might have been telling H.S. and her siblings what to say during interviews. The defense also sought to portray Noel as having a controlling, domineering personality. Appellant testified that Noel was a "control freak" who sought to "wear the pants" in the marriage. He said that although he worked a part-time job at night in addition to his full-time day job, Noel accused him of being lazy and complained that he was not sufficiently helpful around the house. Appellant's pastor, from whom the couple had sought counseling, also testified that Noel "was very controlling, very demanding." The defense also called numerous witnesses to testify to appellant's good character and reputation for honesty, and to Noel's reputation for dishonesty.

The jury returned a verdict convicting appellant of sexually assaulting H.S. The jury found appellant not guilty on the counts accusing him of sexually assaulting his other daughters.

## DISCUSSION

In his first issue on appeal, appellant contends that the trial court erred by permitting Noel to testify regarding incidents in which appellant penetrated her with his finger without her consent. Appellant urges that this was extraneous misconduct evidence having no relevance to any disputed issue in the case, and that it served merely to show his bad character. *See* Tex. R. Evid. 404(b).[2] The State responds that appellant opened the door to the testimony through his

---

[2] Appellant also contends that any probative value the evidence might have had was outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403. Appellant does not refer us to a trial

cross-examination of Noel. The State also asserts that the testimony was relevant to rebut the defensive theories of accident and lack of intent. We review the trial court's decision to admit the evidence under an abuse of discretion standard, and we will disturb the trial court's ruling only if it was outside the zone of reasonable disagreement. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

The defense was made aware of the substance of the challenged testimony prior to trial. At a hearing before testimony began, the court granted appellant's motion in limine prohibiting the State from adducing the testimony without first approaching the bench and obtaining a ruling on its admissibility at that time.

During his cross-examination of Noel Schoff, defense counsel repeatedly asked her why she had unquestioningly accepted the accusations against appellant:

> Q. And as I understand your prior testimony, you didn't question this at all with her, you didn't go into any details with her, or when, or how, or why, or you didn't even have any questions for your husband about it, did you?
>
> A. At the very moment that it happened, all I wanted to do was take care of [H.S.]. I didn't think to ask anything else. With what she said, it was pretty obvious, and there were other reasons that would make me believe that.
>
> . . .
>
> Q. You chose, rather than to question her about it, you just went ahead and chose to infer that there was something sexually about it that her daddy did to her, rather than it being an accident, right?

---

objection on this ground, and we do not find one. In the absence of an objection, appellant's rule 403 argument was not preserved for appeal. *See Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1991) (op. on reh'g).

A. There's other things that he had been doing that made me have not such a hard time wondering.

. . .

Q. Okay. So why wouldn't you think she has told one lie and she is telling another lie to get out of that lie? I mean, you didn't even question her on it? You jumped on it.

A. Because of other things I had experienced in the marriage.

. . .

Q. Why didn't you give him the benefit of the doubt?

A. Because of other things I had gone through with him in marriage, other things.

. . .

Q. All four kids, either they were in the bath or they were being cleaned. You know, why couldn't you, as a wife of fifteen years and their mother, have just thought, "Well, it was an accident. Your daddy didn't mean to hurt you. . . ." Why didn't you tell her that instead of going off and inferring the sexual things against your husband?

A. Number one, I have never, in cleaning a chid, put anything up inside of anybody to the point of talking about that she was bleeding or anything else.

Number two, because of the things that had happened in my marriage before, there were situations that happened.

At this point, the State asked to approach the bench saying, "It's regarding [defense counsel's] Motion in Limine." Following this bench conference, which was not recorded, counsel resumed his cross-examination and soon returned to the subject of Noel's failure to give appellant the benefit of the doubt:

8

Q. Okay. So you didn't give the daddy the benefit of the doubt, that it could have been an accident or parental cleaning, and you don't get on [H.S.] for maybe lying about what she is telling about her daddy just to get out of trouble, you jump on it and take opportunity with it?

A. Because of what I had experienced in my marriage.

During a subsequent break and outside the jury's presence, the prosecutor argued to the court that "it is now permissible for me to ask Mrs. Schoff questions about, during the course of their marital relationship, digital penetration situations between Mrs. Schoff and Mr. Schoff. It goes to explain some of the questions she was limited from answering on cross." The State also urged that this evidence was admissible to show absence of accident or mistake, and to show motive and intent. Defense counsel argued that the proposed testimony was irrelevant because "the incidents she wants to talk about are involving adult relationships between husband and wife . . . and in no way, shape, form or fashion involves children . . . ." The court ruled that appellant had opened the door to the testimony: "[Y]our questions were directed to this witness and what information she had to support—" The court added, "[W]e heard numerous times her answer other things . . . . In fact, the last round of questions, after it was already objected to and brought to our attention was, why didn't she tell the girls that dad had made an accident, that there was a mistake . . . . To that extent, I am going to allow you to go into it." Before the jury returned, the court clarified its ruling:

> I want to clarify, I said that the door had been opened, and I believe it has, but I also believe that the prosecution has proved an exception under 404(b). I also think it's clear and it is the opinion of this Court that you can't request a Motion in Limine in an attempt to bind the tongue of a witness and then turn around and ask a witness questions that the witness is precluded from answering in an attempt to—or is an indirect or direct means of impeaching the witness's veracity, character, or credibility, and for that reason I am going to allow that testimony in.

9

The challenged testimony was adduced by the State on redirect, after the defense concluded its initial cross-examination of Noel:

> Q. . . . [Defense counsel] was asking you about, "Why did you just believe [H.S.]? You just believed her, you didn't assume it was an accident, you didn't assume it was a mistake?" And you kept trying to say, "Things from our marriage, things from our marriage." What things?
>
> A. One night I woke up and he had his finger inside of me, another time he was raping me, but when he had his finger inside of me that one night and I woke up, it was like, "What are you doing," and he was like, "I am just asleep, I don't know what you are talking about," and I just ran in the other room because I didn't know what to do . . . .
>
> . . .
>
> A. He would put his finger straight up into me when I would be in the kitchen or whatever, the girls would be right there, and I would push him away and tell him to stop.
>
> Q. How often would that happen? How often would he digitally penetrate you?
>
> A. A lot.
>
> . . .
>
> Q. Okay. Not every day?
>
> A. No, Ma'am.
>
> Q. How often would you say?
>
> A. A lot, and I kept telling him over and over again, that was a big fight we would have, "I told you and I have told you over and over again, don't do that when the girls are in the room."

10

Noel testified that appellant encouraged her to wear short skirts, but she did not want to wear them because "it was easy access for him and I felt like a piece of meat when he did it. It wasn't a loving, 'I want to make love with you type of thing.' It was aggressive and it hurt." She testified that she woke up to find appellant digitally penetrating her often enough that "it was hard for me to be around him and didn't even want to make love to him anymore. I got to where I didn't want to have anything to do with him sexually because I didn't feel like his wife anymore. I felt like a piece of meat."

We conclude that the trial court properly admitted the challenged testimony under the rule of optional completeness. Under this rule, "[w]hen part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence . . . ." Tex. R. Evid. 107. This rule permits the introduction of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter opened up by the adverse party. *Walters v. State*, 247 S.W.3d 204, 217-18 (Tex. Crim. App. 2007) (citing *Parr v. State*, 557 S.W.2d 99, 102 (Tex. Crim. App. 1977)). It is designed to reduce the possibility of the jury receiving a false impression from hearing only a part of some act, conversation, or writing. *Id.*

Defense counsel asked Noel six times why she had taken H.S.'s accusations, and later those of her other daughters, at face value, without considering the possibility that the accusations were false or that the incidents described were merely innocent accidents. Each time, Noel answered that "other things" she had experienced in the marriage led her to believe the accusations. Appellant

11

argues that Noel could have answered the questions without making an "elliptical reference" to the extraneous misconduct, but having repeatedly asked the question, appellant is in no position to complain of the answer he received each time. After the defense adduced Noel's testimony that she believed her daughters' accusations because of "other things" that had happened in her marriage, the State was entitled to ask Noel what those things were.

Defense counsel also opened the door to the challenged testimony by cross-examining Noel about her sexual relationship with appellant, including the unwelcome touching appellant now contends was irrelevant and inadmissible. Counsel asked Noel if she "sometimes [was] awoken by him playing with you"; she said that she was. Counsel asked Noel if she and appellant sometimes had "intimate touching going on between each other"; she said that they did. Counsel asked Noel if they were "discrete when it came to sex," prompting her to answer, "No, sir, and it made me very angry when he wasn't." Counsel asked Noel, "Did you ever complain to [appellant] about him touching your vagina while the girls were around?" She said that she did and added, in response to counsel's follow-up questions, that she did not know if the girls ever saw appellant touch her in that way. Finally, counsel asked Noel:

> Q. Did you, after you had separated from [appellant], ever complain to any of the counselors about his sexual advances to you during the course of the marriage?
>
> A. What do you mean by sexual advances?
>
> Q. Well, his ways of intimately letting you know he wanted to have sex, or he was—
>
> A. I complained about something, but it wasn't that . . . .

12

Q. Oh, that's where you talked about him walking up and touching your vagina?

A. Yes.

By adducing this testimony regarding appellant's unwelcome sexual advances and touching, the defense opened the door for the State to more fully develop the circumstances under which appellant would touch and penetrate his wife with his fingers.[3]

The trial court did not abuse its discretion by admitting Noel's testimony regarding the incidents in which appellant penetrated her with his finger without her consent. Issue one is overruled.

Appellant's second issue complains of the admission of testimony by Mendocino Barnes, to whom appellant was married from 1988 to 1990. Called by the State as a rebuttal witness, Barnes testified, "[I]t's a very bizarre thing to be raped by your husband, and that was a very frequent thing in our marriage." Asked if there was "sex without your consent," Barnes replied, "Sexual acts, waking up and having him on top of me, being pinned down to the bed, being touched in ways that I was not comfortable with outside of the house, hands up my skirt, things of that nature." Barnes testified that appellant would fondle her breasts and put his hands up her skirt or down her pants, even in public places. Appellant contends that this testimony was improper character-conformity evidence having no relevance to any legitimate issue in the case. *See* Tex. R.

---

[3] We express no opinion on the State's alternative contention that the testimony was admissible under rule 404(b) to rebut appellant's defensive theories.

13

Evid. 404(b).[4] We again review the court's decision to admit the challenged testimony for an abuse of discretion.

During his testimony, appellant denied engaging in the acts of sexual misconduct described by Noel and discussed previously. The State argues that Barnes's testimony was admissible to rebut those "affirmative misrepresentations" by appellant. *See Lagrone v. State*, 942 S.W.2d 602, 613 (Tex. Crim. App. 1997) (holding that specific instances of conduct are admissible to "correct affirmative misrepresentations made on direct examination"); *see also* Tex. R. Evid. 608(b) (prohibiting the use of specific instances of conduct to attack or support witness's credibility). But appellant did not mention Barnes during his own testimony, much less make any representations concerning his behavior, sexual or otherwise, during his marriage to her. Barnes's testimony did not rebut any affirmative misrepresentation made by appellant.

Alternatively, the State contends that Barnes's testimony was admissible to rebut appellant's defensive theory that Noel had coached or otherwise used her domineering personality to induce her daughters to falsely accuse appellant of sexual misconduct. But Barnes's testimony describing how appellant forced her into unwanted sexual activity had no tendency to prove or disprove appellant's suggestion that Noel was a manipulative "control freak" who would or could coerce her daughters into making false accusations against their father. *See* Tex. R. Evid. 401 (defining "relevant evidence").

---

[4] Appellant also makes a rule 403 argument, but he did not object to Barnes's testimony on that ground.

Finally, the State contends that Barnes's testimony was admissible to rebut the suggestion, raised by defense counsel during his cross-examination of the State's witnesses, that if appellant had penetrated his daughters with his finger, it had been an accident. Although we are reluctant to second-guess a trial court's discretion to admit evidence, we conclude that the testimony was also irrelevant to that issue. Barnes's testimony that appellant had touched her during their marriage in ways or under circumstances that she found objectionable had little, if any, tendency to suggest, beyond mere character conformity, that appellant had deliberately penetrated his minor daughters with his finger.

We are satisfied that any error in the admission of Barnes's testimony was harmless. *See* Tex. R. App. P. 44.2(b). The prosecutor mentioned Barnes's testimony in her final argument, but only to remark that it tended to corroborate Noel's considerably longer and more detailed testimony, the propriety of which we have already discussed. Insofar as the jurors may have been concerned with the side issues regarding appellant's relationship with Noel, we are confident that Barnes's testimony leant little additional force to Noel's testimony on that subject. We also note that during the course of deliberations, the jury asked to hear portions of the counselor's testimony regarding H.S.'s diagnosis of post-traumatic stress disorder. This suggests that the jurors' deliberations were focused on the content of the girls' outcry statements and testimony, and on the evidence (or lack of evidence) tending to corroborate the girls' accusations. This suggestion is also bolstered by the fact that the jury found appellant not guilty of penetrating his three younger daughters, as to whom there was considerably less corroborative evidence than there was in regard

15

to H.S. On this record, the admission of Barnes's challenged testimony did not affect appellant's substantial rights. Issue two is overruled.

In his third and final issue, appellant contends that the evidence is factually insufficient to support the jury's guilty verdict. When there is a challenge to the sufficiency of the evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). In a factual sufficiency review, all the evidence is considered in a neutral light, including the testimony of defense witnesses and the existence of alternative hypotheses. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). Although due deference must be accorded the fact finder's determinations, particularly those concerning the weight and credibility of the evidence, the reviewing court may disagree with the result in order to prevent a manifest injustice. *Johnson*, 23 S.W.3d at 9; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). The evidence will be deemed factually insufficient if the evidence supporting the verdict is so weak as to make the finding of guilt clearly wrong or manifestly unjust, or if the verdict is against the great weight and preponderance of the available evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); *Johnson*, 23 S.W.3d at 11.

Appellant contends that the evidence supporting the verdict is too weak. He urges that H.S.'s outcry statements and trial testimony were unbelievable. Appellant asserts that it is unbelievable that he would engage in sexual activity while cleaning his daughter following an attack

16

of diarrhea.  He considers H.S.'s testimony regarding the butter knife equally incredible, and notes that the tear in H.S.'s hymen is not corroborative of her outcry because the nurse was unable to give a precise date for the injury.  The fact that H.S.'s outcries became more detailed over time is evidence, in appellant's view, of the child having been coerced or influenced by the interview process itself.

Appellant also contends that the evidence against the verdict substantially outweighs the evidence supporting it.  He points out that Noel admitted that H.S. sometimes lied.  He also stresses the testimony regarding the investigators' initial doubts regarding the truth of the accusations.  Appellant refers us to the testimony regarding Noel's bad reputation for truthfulness.  In his brief, appellant refers to "at least 18 items of impeachment and circumstantial proof (not to mention reputation testimony) supporting Appellant's theory that this child made up a lie to get out of a lie.  This was successful because it met her mother's emotional needs, a mother who appears to be a professional victim/manipulator."

Appellant's arguments to this Court challenging the credibility of the State's evidence, and in particular the credibility of H.S.'s outcry testimony, echo the arguments he made to the jury at trial.  The jury obviously resolved the credibility issues in the State's favor, at least with respect to the accusation that appellant unlawfully penetrated H.S.  A guilty verdict is not manifestly unjust simply because the fact-finder resolved conflicting views of the evidence in the State's favor.  *Roise v. State*, 7 S.W.3d 225, 233 (Tex. App.—Austin 1999, pet. ref'd).  Viewing the record as a whole in a neutral light, we conclude that the verdict convicting appellant of sexually assaulting H.S.

17

was neither manifestly unjust nor against the great weight and preponderance of the evidence. Issue three is overruled.

The judgment of conviction is affirmed.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed:   February 23, 2010

Do Not Publish

18